95 F.3d 892
 43 ERC 1586, 65 USLW 2208, 27 Envtl.
L. Rep. 20,047,
96 Cal. Daily Op. Serv. 6847,
96 Daily Journal D.A.R. 11,209
 CITY OF CARMEL-BY-THE-SEA; Monterey Peninsula Regional Park
District; Hatton Canyon Coalition; Sierra Club,
Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION; Admiral James
Busey; Federal Highway Administration; Thomas D. Larson;
California Department of Transportation; James Van Loben
Sels; Thomas L. Pollock; et al., Defendants-Appellees.
 No. 94-16234.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 13, 1995.
Decided Sept. 13, 1996.
 
 Rachel B. Hooper and Susannah T. French, Shute, Mihaly & Weinberger, San Francisco, CA, for plaintiffs-appellants.
 Martin W. Matzen and Joan M. Pepin, United States Department of Justice, Washington, DC, and Antonio R. Anziano, San Francisco, CA, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California, Spencer Williams, Senior District Judge, Presiding. D.C. No. CV-92-20002 SW (PVT).
 Before NORRIS, BEEZER and TROTT, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 This appeal arises from a proposed realignment of California State Highway 1 from the outskirts of the city of Carmel-by-the-Sea to nearby Hatton Canyon in order to relieve traffic congestion.
 
 
 2
 Plaintiffs City of Carmel-by-the-Sea, Monterey Peninsula Regional Park District, Hatton Canyon Coalition and Sierra Club (collectively, "Carmel") appeal the district court's grant of summary judgment in favor of defendants United States Department of Transportation, other Federal defendants (collectively, "Federal defendants"), California Department of Transportation ("Caltrans") and other State defendants (collectively, "State defendants"). Carmel challenges the adequacy of an Environmental Impact Statement/Report ("EIS/R") under applicable provisions of the National Environmental Policy Act ("NEPA") and the California Environmental Quality Act ("CEQA"). Carmel also challenges the adequacy of the Federal Highway Administration's statement of compliance with Executive Orders 11,988 and 11,990.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, vacate in part, reverse in part, and remand.
 
 
 4
 * California State Highway 1 suffers severe traffic congestion problems along a roughly three-mile stretch near Carmel. At the north end of this section of Highway 1, near the Highway 68 interchange, Highway 1 is a four-lane divided highway. As it passes through Carmel it funnels down to a two-lane undivided highway, flanked by numerous intersections and driveways. The section of highway also has three traffic lights and only limited left-turn lanes.
 
 
 5
 The traffic problem on this section of Highway 1 was recognized as early as 1947. Over the past fifty years, debate has simmered over whether to alleviate the problem by widening the existing road or building a new route through Hatton Canyon. Hatton Canyon is an undeveloped area just to the east of Carmel.
 
 
 6
 From time to time since the late 1940's, with shifting political winds, many interested groups, including several of the parties to this litigation, have changed positions on where the road expansion should be located, and whether the expansion should be a freeway or a scenic highway. The policy issues of environmental protection, development, aesthetics, and the like are highly emotionally charged. The 10,000-page administrative record is replete with evidence of the detailed and emotional attention the Highway 1 issue has received.
 
 
 7
 We review the EIS/R for the limited purpose of determining whether proper administrative procedures were followed in the course of the adoption of the administrative decision to build a freeway in Hatton Canyon.
 
 
 8
 In 1984, Caltrans and the Federal Highway Administration began serving jointly as "lead agencies" to prepare a combined EIS/R (NEPA requires an EIS and CEQA requires an EIR). They released a Draft EIS/R in November 1986. The purpose stated in the Draft EIS/R is "to improve the capacity of Highway 1 and reduce crossing and turning conflicts." 11 SAR 3121.[1] No specific minimum traffic flow level was stated. The Draft EIS/R discussed Alternatives 1 (variations of the Hatton Canyon alignment); 3, 4, and 6 (variations of widening the existing Highway 1 to a number of lanes correlative to the Alternative number-e.g., Alternative 3 is to widen Highway 1 to 3 lanes, etc.); and 7 (a combination of widening the existing Highway 1 and constructing a road in Hatton Canyon). There is no Alternative 2 or 5.
 
 
 9
 The Draft EIS/R drew a large number of comments. A report commissioned by the Hatton Canyon Coalition entitled "Highway 1/Carmel Area Traffic Analysis" was submitted in July, 1991. 24 SAR 7389 et seq. The report was prepared by the engineering firm Wilbur Smith Associates and the architecture/planning firm Skidmore, Owings & Merrill ("Smith Report"). The Smith Report presented a highway widening alternative which was not analyzed by the EIS/R, but was discussed by the Federal Highway Administration and Caltrans in a separate memorandum. IX FAR 3995-4001. Specifically, the Smith Report recommended a 4-lane highway widening alternative with interchanges at two major intersections (the EIS/R's 4-lane alternative recommended only one interchange). The project cost of the Smith Report alternative was estimated at $24-31 million.
 
 
 10
 The Final EIS/R was released on October 8, 1991. The Final EIS/R's goal was changed from the goal stated in the Draft EIS/R to require a specific traffic flow Level of Service C.[2] Although the goal changed between the Draft and Final EIS/R, the Final EIS/R contains a substantially similar range of alternatives as were originally outlined in the Draft. The Final EIS/R focuses primarily on factors which would improve traffic flow to Level of Service C, and found one alternative, Alternative 1C Modified, was the one most likely to meet the desired Level of Service:
 
 
 11
 The alternative selection was based upon an analysis of traffic capacity, delay, traffic operation, safety, driving time, local and regional planning, public input, environmental impacts and mitigation, and public costs.... Alternative 1C Modified would provide acceptable traffic service (Level of Service C, as defined by Monterey County) throughout the project area.
 
 
 12
 FEIS/R at vii; 24 SAR 7639. The EIS/R concluded that none of the other alternatives proposed in the Draft EIS/R would meet the desired Level of Service: "With alternatives 3, 4, 4 Modified, and 6, intersections would be at or exceed capacity during peak traffic periods."
 
 
 13
 There were many public comments in response to the Final EIS/R. Many of those comments expressed concerns about the EIS/R's treatment of the environmental effects of Alternative 1C Modified on Hatton Canyon. Others commented on the changed statement of purpose and need between the Draft and the Final EIS/R. The Federal Highway Administration issued its Record of Decision on November 11, 1991, and Caltrans issued a Notice of Determination on December 3, 1991.
 
 
 14
 Carmel filed a complaint in this action on January 2, 1992. In an amended complaint filed February 25, 1992, Carmel sought declaratory, injunctive and mandatory relief, contending that the Final EIS/R violated NEPA, CEQA and that the associated "only practicable alternative" findings violated Executive Orders 11,988 and 11,990. Carmel also requested costs and attorney's fees pursuant to Cal. Civ. P.Code § 1021.5 and 28 U.S.C. § 2412. Statutory authority to seek judicial review of agency action under NEPA is provided by the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136 (1971). Judicial review of agency actions under CEQA may be had under the provisions of CEQA, Cal. Pub. Res.Code § 21000 et seq. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367.
 
 
 15
 On May 16, 1994, the district court ruled on cross-motions for summary judgment. It granted defendants' motion for summary judgment and denied Carmel's motion. It accordingly entered judgment in favor of defendants. Carmel timely appeals.
 
 II
 
 16
 We review de novo the district court's grant of summary judgment. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 
 17
 Pursuant to the Administrative Procedure Act, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1401 (9th Cir.1995). Agency decisions may also be set aside if they are undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).
 
 
 18
 Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861-62, 104 L.Ed.2d 377 (1989). The reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Id.
 
 
 19
 We may reverse under the arbitrary and capricious standard only if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise. Dioxin/Organochlorine Ctr. v. Clarke, 57 F.3d 1517, 1521 (9th Cir.1995). In particular, we employ a "rule of reason" in determining whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." Seattle Audubon Society v. Espy, 998 F.2d 699, 703 (9th Cir.1993).
 
 
 20
 In challenges under CEQA, the standard of review is "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." Cal. Pub. Res.Code § 21168.5. An agency fails to proceed in a lawful manner where its EIR omits relevant information and thus precludes informed decision making and public participation. Kings County Farm Bureau v. City of Hanford, 221 Cal.App.3d 692, 270 Cal.Rptr. 650, 657 (1990). Appellate review of a trial court's decision concerning the adequacy of an EIR is de novo; the ultimate questions regarding whether an EIR complies with CEQA "are essentially questions of law [so that] the trial and appellate courts perform essentially the same function." Lewin v. St. Joseph Hosp., 82 Cal.App.3d 368, 146 Cal.Rptr. 892, 904 (1978).
 
 III
 
 21
 The National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., declares a broad national commitment to protecting and promoting environmental quality. 42 U.S.C. § 4331. The primary mechanism of NEPA is the Environmental Impact Statement, or EIS. 42 U.S.C. § 4332. The EIS's requirements are procedural, not substantive, and are designed to ensure that an agency takes a "hard look" at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public. Robertson v. Methow Valley Citizens' Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). The California Environmental Quality Act (CEQA) is basically similar to NEPA, with similar procedural requirements. See Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 522 n. 1 (9th Cir.1994).
 
 
 22
 Carmel challenges five aspects of the EIS/R prepared for the Hatton Canyon freeway: (1) the project-specific effects on wetlands, (2) the project-specific effects on the Monterey Pine, (3) the cumulative impacts on the environment, (4) the freeway's growth-inducing consequences, and (5) the consideration of reasonable alternatives.
 
 
 23
 We determine that the EIS/R failed to consider adequately the effects on wetlands, failed to analyze adequately the project's cumulative impacts, and failed to consider reasonable alternatives, in light of the statement of purpose and need articulated in the Final EIS/R. We reverse as to those issues. The failure to consider reasonable alternatives also requires that we reverse on the adequacy of the "only practicable alternative" findings required by Executive Orders 11,988 and 11,990. We remand with instructions to enter summary judgment in favor of Carmel as to the wetlands and consideration of alternatives issues. We remand for consideration by the district court the cumulative impacts issue. We affirm the district court as to all other issues.
 
 A. Wetlands
 
 24
 The EIS/R asserted that the Hatton Canyon freeway, Alternative 1C Modified, would remove approximately 12 acres of wetlands. 25 SAR 7791. The EIS/R also noted that proposed mitigation measures would not be sufficient to result in no net loss of wetlands. The EIS/R proposed mitigation via "on-site replacement/enhancement" of wetlands. 25 SAR 7798.
 
 
 25
 Several agencies have noted that new wetlands have emerged in Hatton Canyon. These new wetlands have not been addressed in the EIS/R. In a letter dated 11/12/91, the Army Corps of Engineers (the "Corps") noted that the EIS/R does not describe the emergent wetlands in the lower canyon, which have vegetation that is rare in California. It stated:
 
 
 26
 The displacement of this wetland for the construction of a proposed freeway would require in-kind mitigation. At this time, the Corps is not aware of a successful reconstruction of this habitat type.
 
 
 27
 27 SAR 8563. In a letter dated November 12, 1991, the Environmental Protection Agency ("EPA") also expressed concerns about the proposed wetlands mitigation. Because of the possibility of new wetlands created by the 1989 Loma Prieta earthquake, the Environmental Protection Agency recommended a redelineation of wetlands. 27 SAR 8572. Finally, a letter dated September 17, 1992, from the Corps is even more emphatic. It notes that its 1987 wetlands survey "is now outdated and has expired" due to "subsequent earth movements." Ex. 3, Plaintiffs' Req. for Judicial Notice, 3/19/93. Because the Corps has decreed that its 1987 wetlands delineation has expired,[3] the EIS/R's mitigation plan based on that delineation is also out of date. Reliance on stale scientific evidence is sufficient to require re-examination of an EIS. Seattle Audubon Society v. Espy, 998 F.2d 699, 704-705 (9th Cir.1993).
 
 
 28
 There are a number of other alleged deficiencies with the EIS/R's proposed mitigation measures. Because we hold that the EIS/R's reliance on stale scientific evidence renders it inadequate, we do not address whether the following alleged deficiencies also affect the adequacy of the EIS/R.
 
 
 29
 First, in the Hatton Canyon drainage channel, there is a "highly disturbed" 2.1 acre site which is proposed for rehabilitation as wetland. In its 11/12/91 letter, the Corps found curious this reference to "past disturbances" which degraded some of the canyon's wetlands:
 
 
 30
 "[P]ast disturbances" should be fully described. This description should include the nature, magnitude, source, and date of the initial disturbance as well as any other that have occurred to date.
 
 
 31
 27 SAR 8563. In a letter dated November 22, 1991, the U.S. Fish and Wildlife Service shed some light on the "past disturbances," contending that part of the new wetland proposed as mitigation was in fact the replacement of wetlands allegedly illegally destroyed by Caltrans in the mid-1980's:
 
 
 32
 Information forwarded to this office indicates that Caltrans bulldozed a tributary creek in Hatton Canyon in 1984 and 1986 without permits from the Army Corps of Engineers.... This acreage should be removed from any discussions or inclusions within the mitigation plan.... The statement that the Service "concurred" with the Mitigation Plan is misleading and absolutely incorrect.
 
 
 33
 27 SAR 8626. The Fish and Wildlife Service concluded that "[t]he mitigation plan for the preferred alternative is not sufficient." In other words, the Fish and Wildlife Service indicated that Caltrans is required to restore these disturbed wetlands because of its previous wrongdoing, and is therefore not permitted to count such restoration as mitigation for the Hatton Canyon Freeway.
 
 
 34
 Second, another 2.5 acre portion of the Hatton Canyon drainage channel would be realigned to carry highway runoff. The Corps criticized the plan to use freeway runoff as 2.5 acres of wetlands mitigation, saying that such "wetlands" would be "of low quality due to buildup of petrochemical toxins and heavy metals from highway runoff, sedimentation from the adjacent slope, and its unnatural linear design." 27 SAR 8566.
 
 
 35
 Additionally, the EIS/R proposed up to 11.09 acres of off-site replacement or enhancement of wetlands. The EIS/R acknowledged that it might be necessary to provide drip irrigation systems to irrigate the new wetlands. 25 SAR 7796. In its 11/12/91 letter, the Corps noted that the Monterey County Water Management District had not agreed to assume responsibility for operating and maintaining the new wetlands, contrary to the representations of the EIS/R. Second, it observed that there would likely be problems in obtaining ownership of the proposed mitigation sites. Finally, it observed that, for a variety of reasons, water to irrigate the new artificial wetlands might be unavailable. 27 SAR 8566-8567.
 
 
 36
 The EIS/R frankly concluded that much of the proposed Hatton Canyon freeway's damage to wetlands will not be mitigable: "Even with proposed mitigation, the impact to riparian wetlands from Alternative 1 is considered significant. The riparian wetland, with associated upland in Hatton Canyon can not be duplicated to fully provide in-kind replacement of habitat values." 25 SAR 7797. The Corps, the Fish and Wildlife Service and the Environmental Protection Agency all agree with the EIS/R's assessment of the nonduplicability of wetlands. They take issue, however, with the EIS/R's "flexible" approach, calling it insufficiently specific to facilitate meaningful evaluation. In its 11/12/91 letter, the Environmental Protection Agency concluded:
 
 
 37
 Because the wetland compensation measures described in the FEIS are not specific, EPA cannot adequately judge whether the measures as described would offset project impacts. We understand that some of the lands adjacent to the Carmel River proposed for wetland establishment already support wetland vegetation or are unavailable as mitigation sites.
 
 
 38
 27 SAR 8572-8573.
 
 
 39
 In addition to specific errors in the EIS/R, agencies voiced concern about the adequacy of the EIS/R's consideration of effects on wetlands in both California generally and, specifically, Hatton Canyon. In its 11/12/91 letter, the Corps argued that the destruction of Hatton Canyon wetlands should be considered in light of the widespread destruction of wetlands throughout California:
 
 
 40
 [T]he existing habitat should be described relative to its regional importance. Riparian and wetland habitats have been disappearing at an alarming rate throughout the state of California. Currently, large, contiguous tracts of relatively undisturbed habitat such as that contained in Hatton Canyon are extremely rare and provide a significant habitat resource.
 
 
 41
 27 SAR 8563. In its 11/22/91 letter, the Fish and Wildlife Service echoed the Corps' concern that "enhancement" of existing wetlands does not compensate for the outright loss of other wetlands. Second, the Fish and Wildlife Service doubted that artificial wetlands could replicate natural ones:
 
 
 42
 [T]he Service does not believe that it is possible to replace all fish and wildlife values which would be lost from project construction. The re-establishment of individual mitigation sites at various location[s] cannot duplicate the unique mosaic of habitats in the Hatton Canyon ecosystem.
 
 
 43
 27 SAR 8625-8626.
 
 
 44
 Because the EIS/R is based on stale scientific evidence, we hold that the EIS/R's proposed wetlands mitigation is inadequate.[4]
 
 B. Cumulative Impacts
 
 45
 An EIS/R must analyze the cumulative impacts of a proposed project. 40 C.F.R. § 1508.25(c)(3). 40 C.F.R. § 1508.7 defines cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ..."The Federal defendants contend that the EIS/R adequately addresses cumulative impacts. They point to two paragraphs discussing the overall status of the Monterey Pine. They also assert that the Hatton Canyon freeway would have no cumulative impacts on wetlands. They reason that wetlands in Hatton Canyon have been relatively untouched in the past, and that there are no reasonably foreseeable projects in Hatton Canyon that would further affect wetlands there. The Final EIS/R also contains a separate chapter discussing cumulative impacts. 25 SAR 7886-7887. That chapter is slightly more than one page long, and refers to the Carmel Valley Master Plan EIR.[5]
 
 
 46
 The district court held that the Final EIS/R satisfies NEPA, noting that the EIS/R's analysis was exceptionally brief (for the most part it just outlines areas of the environment that will be adversely affected). Nonetheless, the district court concluded that the analysis was sufficient because plaintiffs had not identified any other actions which might have affected the Monterey pine, wildlife, or wetlands. Absent such actions, the district court held, the EIS need not discuss cumulative impacts. The district court also rejected Plaintiffs' challenge to the examination of the cumulative impacts on the Hickman's onion, finding that the agency had taken a "hard look" at the effect because it calculated the percent of onion population that would be lost as a result of the project:
 
 
 47
 According to the Plaintiffs, the EIS did not adequately analyze the project's cumulative impacts on the Hickman's onion, which they note is a likely candidate for listing under the Endangered Species Act. See Fed. Admin. Rec. V:2105; State Admin. Rec. 26:8250. However, the EIS states explicitly that 16% of [the] Hatton Canyon Hickman's onion population will be affected by the project. EIS IV-30. It further notes that "[n]early all of the other populations of Hickman's onion in Monterey County are threatened by development pressures." EIS IV-31. This analysis provides information about the Hickman's onion population sufficient to ensure that decision makers have taken a "hard look" at these impacts and that the public has been made aware of them.
 
 
 48
 Order Denying Defendants' Motion to Dismiss, etc. (5/12/94) at 12-17.
 
 
 49
 The Fifth Circuit has articulated a set of guidelines for a meaningful cumulative-effects study. Such a study should identify:
 
 
 50
 (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in the area from the proposed project; (3) other actions-past, proposed, and reasonably foreseeable-that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.
 
 
 51
 Fritiofson v. Alexander, 772 F.2d 1225, 1245 (5th Cir.1985), abrogated on other grounds, Sabine River Auth. v. United States Dep't of Interior, 951 F.2d 669 (5th Cir.1992), cert. denied, 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992).
 
 
 52
 We adopt the Fifth Circuit's analysis of what a cumulative impacts analysis requires. The EIS/R's cumulative impacts analysis is insufficiently detailed or specific to permit a reasoned analysis under the Fifth Circuit's criteria. Furthermore, we have been unable to locate the Carmel Valley Master Plan EIR in either the state or federal administrative record. Because the Final EIS/R is not sufficient on its own to satisfy the Fifth Circuit criteria, and because we are unable independently to evaluate the cumulative impacts analysis in the Carmel Valley Master Plan EIR, we vacate the judgment of the district court as to this issue and remand for reevaluation in light of our adoption of the Fifth Circuit's criteria.
 
 C. All Reasonable Alternatives
 
 53
 Consideration of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. "[A]n agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." Alaska Wilderness Recreation v. Morrison, 67 F.3d 723, 729 (9th Cir.1995) (quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 (9th Cir.1992)). Defendants materially altered the statement of purpose and need between the Draft and Final EIS/R, by adding a specific requirement of attaining Level of Service C. They did not, however, update the list of alternatives under consideration to reflect the more specific goals of the Final EIS/R's statement of purpose and need. All of the alternatives except the one chosen fail even to come close to satisfying the new goals. Because the alternatives considered in the Final EIS/R were not "dictated by the nature and scope of the proposed action," as outlined in the statement of purpose and need, we reverse as to this issue.
 
 
 54
 In the Draft EIS/R, the "purpose and need" for some sort of highway expansion was stated in general terms:
 
 
 55
 The purpose of the proposed project alternatives is to improve the capacity of Highway 1 and reduce crossing and turning conflicts associated with several local streets and private driveways. Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the existing local street system.
 
 
 56
 11 SAR 3121. The Draft EIS/R makes reference to the Monterey County General Plan, which "has established Level of Service C as the minimum acceptable level of service,"[6] but not in a way that compels the inference that attainment of Level of Service C was the project's specific goal. The Draft purpose and need statement says: "Improvements to Highway 1 are needed to reduce existing congestion on Highway 1 in the Carmel Hill area. The project alternatives would result in the following improvements to varying degrees: ... Would be more consistent with the Monterey County General Plan." VI SAR 3121 (emphasis added). Attaining Level of Service C was not the only way of achieving an improvement in Highway 1's capacity. The Draft EIS/R states that Highway 1 is currently operating at Level of Service E. 6 SAR 3123. Thus Level of Service D would represent an improvement, albeit a lesser one, too.[7]
 
 
 57
 The Final EIS/R states a different, narrower and more specific "purpose and need" than the Draft EIS/R, and specifically targets Level of Service C:
 
 
 58
 The purpose of the project is to relieve current traffic congestion, lessen emergency vehicle response time, reduce crossing conflicts at local intersections and driveways, improve safety, ameliorate air quality, and bring the rural road character back to the local area. Improvement for congestion relief to the area should provide capacity to meet traffic service needs for the next 20 years at Level of Service C in order to be a reasonable expenditure of public funds. Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the local street system.
 
 
 59
 24 SAR 7648.
 
 
 60
 The statement of purpose and need in the Final EIS/R is clearly more detailed and specific than the statement in the Draft EIS/R. The Final EIS/R describes the pertinent alternatives as follows:
 
 
 61
 Alternative 1C Modified provides a four-lane divided freeway on a new alignment through Hatton Canyon from Carmel Valley Road to the existing freeway interchange at Carmel Hill (State Route 68/1). A two-lane conventional highway will cross the Carmel River on a new 57-foot wide bridge and transition into the new freeway near Carmel Valley Road. The existing Carmel River Bridge and the roadway between Oliver Road and the southern limits of the new alignment would be removed. A new connection between the existing highway at Oliver Road and the new alignment would be constructed with an at-grade intersection on the new alignment between Rio Road and the Carmel River Bridge. Interchanges on the new freeway will be constructed at Carmel Valley Road and at Carpenter Street. A grade separation will be constructed at Rio Road. Carmel Valley Road will be widened from two to four lanes between the existing highway and Carmel Ranch Boulevard....
 
 
 62
 ...
 
 
 63
 * * *
 
 
 64
 The estimated cost of the selected alternative [is $33 million].
 
 
 65
 FEIS/R II-1 to II-3; 24 SAR 7660-7662.
 
 
 66
 Alternative 3 would widen the existing highway to three lanes from Carmel Valley Road to Morse Drive, and improve the existing three lane section from Morse Drive to Ocean Avenue. Left-turn channelization would be provided for all public road connections between Carmel Valley Road and Morse Drive. The existing left-turn pocket from southbound Highway 1 to Carmel Valley Road would be lengthened to provide additional storage.
 
 
 67
 [Cost is estimated at $3.7 million.]
 
 
 68
 ...
 
 
 69
 * * *
 
 
 70
 Alternative 4 would widen the existing Highway 1 to four lanes from Rio Road to Ocean Avenue. Left-turn channelization would be provided for all public road connections between Carmel Valley Road and Ocean Avenue. The existing left-turn pocket from southbound Highway 1 to Carmel Valley Road would be lengthened to provide additional storage.
 
 
 71
 [Cost is estimated at $4.5 million.]
 
 
 72
 ...
 
 
 73
 * * *
 
 
 74
 [Alternative 4 Modified] As a result of comments from the public review of the DEIS and comments received at the project Public Hearing, a modification of Alternative 4 was developed which included an interchange at Carmel Valley Road....
 
 
 75
 Four design variations of the interchange were considered:
 
 
 76
 -- Alternative 4-1A would include an interchange which would have both the southbound Highway 1 to eastbound Carmel Valley Road (CVR) movement, and the westbound CVR to southbound Highway 1 movement passing under Highway 1. The two movements would be separated by a traffic signal. The interchange would also provide northbound Highway 1 with on and off ramps.
 
 
 77
 -- Alternative 4-1B does not provide for the westbound CVR to southbound Highway 1 movement at the proposed interchange. The westbound/southbound move would be via Carmel Rancho Blvd. and Rio Road, as is required under present conditions.
 
 
 78
 -- Alternative 4-2A would the be same as Alt 4-1A except that the proposed four lane section of Highway 1 would end at Carmel Valley Road. Between Carmel Valley Road and Rio Road, only two lanes would be provided on highway 1.
 
 
 79
 -- Alternative 4-2B would be the same as Alt 4-1B except that the proposed four lane section of Highway 1 would end at Carmel Valley Road. Between Carmel Valley Road and Rio Road, only two lanes would be provided on Highway 1.
 
 
 80
 [Estimated costs range from $5.3 million to $9.4 million.]
 
 
 81
 ...
 
 
 82
 * * *
 
 
 83
 Alternative 6 would widen the existing Highway 1 to four lanes from Rio Road to Carmel Valley Road. From Carmel Valley Road to Carpenter Street, Highway 1 would be widened to six lanes with a two-way left-turn lane. North of Carpenter Street, the right lane in each direction would become the exit and entrance ramps to/from the Route 68 (west)/Highway 1 interchange. The remaining four through lanes would conform to the existing Highway 1 freeway to Monterey.
 
 
 84
 [Estimated cost is $11.2 million.]
 
 
 85
 ...
 
 
 86
 * * *
 
 
 87
 Alternative 7 would place highway 1 on a new alignment through Hatton Canyon (Alternative 1) and widen the existing Highway 1 northbound roadway to three lanes from Carmel Valley Road to Ocean Avenue (Alternative 3).
 
 
 88
 [Estimated cost is $33-34 million.]
 
 
 89
 FEIS/R II-13 to II-28; 24 SAR 7672-7687. This range of alternatives is essentially similar to the alternatives outlined in the Draft EIS/R.[8]
 
 
 90
 Carmel challenges this change in two respects. First, it argues that the changes themselves, particularly the addition of Level of Service C as a goal, are unjustified. Second, it argues that the changes in purpose and need should have produced correlative changes in the alternatives considered. Carmel argues that the change in project goal placed a duty on the transportation agencies to consider additional alternatives aimed at achieving this new goal; that the Final EIS/R misrepresented the basis for the Level of Service C goal; and that the Final EIS/R was misleading in its repeated false assertions that the Freeway Project would actually achieve this goal.[9]
 
 
 91
 State defendants argue that the statement of purpose and need in the Final EIS/R is reasonable and consistent with the statement in the Draft EIS/R. Federal defendants also argue that the goal of achieving Level of Service C was reasonable and in good faith, and that the Final EIS/R did consider alternatives that did not meet Level of Service C.[10] Carmel responds that the issue is not whether Level of Service C was a reasonable goal; the issues under NEPA and CEQA are whether, once the Level of Service C goal was added, a reasonable range of alternatives was considered.
 
 
 92
 The change between the goals in the Draft EIS/R and the Final EIS/R is material.[11] The Draft EIS/R mentions Level of Service C; the Final EIS/R focuses, almost exclusively, on attaining Level of Service C. The introductory chapter of the Final EIS/R briefly discusses each of the selection criteria: traffic capacity, delay, traffic operation, safety, driving time, local and regional planning, public input, environmental effects and mitigation, and public costs. Traffic capacity, delay and traffic operation all focus on the smoothness of the flow of traffic-in other words, the Level of Service. Traffic operation also includes the specific issue of driveways and secondary street connections that would be faced by any highway widening alternative. Safety will be improved by both an improved level of service and diverting traffic away from the driveways and secondary street connections. Driving time is essentially a factor of the Level of Service-the better the Level of Service, the faster the driving time. Compatibility with local and regional plans is determined by compliance with the goal of Level of Service C. Public opinion was divided between Alternative 1C and Alternative 4 Modified. Environmental effects, including noise and aesthetics as well as consequences for the natural environment, are indeterminate and complex. Public costs fall into three categories: construction costs, costs of delays and costs of accidents. Alternative 1C Modified is by far the most expensive alternative in construction costs, but is projected to be less expensive overall because of fewer delays and improved safety. Again, any alternative that meets Level of Service C will produce fewer delays and improved safety.
 
 
 93
 In short, in the Final EIS/R there are a few issues that require balancing, particularly with respect to the environmental effects. However, Alternative 1C Modified was deemed the clearly preferred choice because it uniquely met Level of Service C, compared with the other alternatives presented. By meeting Level of Service C, Alternative 1C Modified is superior in terms of traffic capacity, delay, traffic operation, safety (to some extent), driving time, compatibility with local and regional planning, and public costs (to some extent). Reading the Final EIS/R in its entirety, it is evident that Level of Service C was the dominant selection criterion. This conclusion is reiterated later in the Final EIS/R:
 
 
 94
 Alternative 1C Modified would provide the best transportation solution for Highway 1 in the Carmel area. It is the only alternative that meets the identified transportation need, is compatible with local plans, and has the support of most local elected officials. Although Alternative 1C Modified would result in significant adverse environmental impacts, mitigation measures have been included as part of the project to minimize these impacts. Given the proposed mitigation measures, the environmental impacts associated with Alternative 1C Modified were not considered substantial enough to override the identified transportation need, and support from the Monterey County Board of Supervisors and Monterey County Transportation Commission.
 
 
 95
 Final EIS/R at II-12 to II-13; 24 SAR 7671-7672.
 
 
 96
 We need not decide whether a rigid requirement of Level of Service C is an admirable or even a preferable goal; that decision is for the agencies. Rather, the issue before us is whether the elevation of Level of Service C from a mere factor mentioned in the Draft EIS/R to the dispositive criterion in the Final EIS/R effectively precluded a reasoned consideration of alternatives.
 
 
 97
 A list of alternatives was developed in conjunction with the general statement of purpose and need in the Draft EIS/R. All of the alternatives discussed in the Draft EIS/R satisfy, to varying degrees, the general goals stated in the statement of purpose and need in the Draft EIS/R. However, when the statement of purpose and need was changed and narrowly focused in the Final EIS/R, only one of the original list of alternatives satisfied the new statement of purpose and need. As the Final EIS/R acknowledges, only Alternative 1C Modified satisfies the more specific statement of purpose and need in the Final EIS/R. By materially changing the goal of the EIS/R without also considering an acceptable range of alternatives designed to meet the changed purpose, Defendants failed to consider a range of alternatives which were "dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." Alaska Wilderness, 67 F.3d at 729.
 
 
 98
 Had Level of Service C been the goal from the outset, it would have been appropriate to exclude from discussion in the EIS/R any of the highway widening alternatives discussed in either version of the EIS/R, because they would not have satisfied the project goals as described in the statement of purpose and need. See Laguna Greenbelt, 42 F.3d 517 (no duty to consider alternatives that do not meet project goals). In such a case, the Draft EIS/R's presentation of alternatives would be inadequate, absent a demonstration that no other conceivable alternatives could approach attainment of Level of Service C.
 
 
 99
 Similarly, had Defendants retained the original statement of purpose and need, yet concluded after analyzing all reasonable alternatives that Alternative 1C Modified would be the best choice, the choice of Alternative 1C Modified would have been entirely appropriate.
 
 
 100
 An agency does not abuse its discretion merely by changing the statement of purpose and need, as long as a range of alternatives remains open to consideration even under the new statement. Such a change presumably will be acceptable if the range of still-possible alternatives permitted sufficient consideration of those alternatives to produce a reasoned choice.
 
 
 101
 But where, as here, a range of alternatives is developed in conjunction with one statement of purpose and need, and the statement of purpose and need is subsequently changed to eliminate all but one of the initial range of alternatives, there has been an abuse of discretion. It does not matter whether the change in purpose and need was undertaken by the agency with outcome-forcing intent. The effect of such a change in purpose and need is either to eliminate the range of alternatives under consideration, or to short-circuit a procedure which requires consideration of practical alternatives presented. Either way, there has been no consideration of a reasonable range of alternatives adequate to satisfy NEPA.
 
 
 102
 Our review of the EIS/R is guided by a "rule of reason." Seattle Audubon Society, 998 F.2d at 703; Citizens of Goleta Valley v. Board of Supervisors, 52 Cal.3d 553, 276 Cal.Rptr. 410, 801 P.2d 1161 (1990). The Final EIS/R's consideration of alternatives violates that rule of reason. The Draft EIS/R articulated a broad statement of purpose and need and listed a reasonably thorough range of alternatives that satisfied that statement. The Final EIS/R articulated a narrower, more specific statement of purpose and need, yet retained the same list of alternatives, notwithstanding the fact that only one of the original list of alternatives even came close to satisfying the new statement of purpose and need. The Federal Highway Administration and Caltrans should have either prepared appropriate new alternatives in light of the new statement of purpose and need, or else retained the original statement of purpose and need and provided a reasoned analysis of all relevant factors.
 
 
 103
 We recently considered a similar issue in Laguna Greenbelt, 42 F.3d 517, where we held that there was no duty to consider alternatives suggested by an expert's report where those alternatives failed to meet the project goals. Laguna Greenbelt is distinguishable from the present case in several respects. First, the EIS/R in that case apparently stated only a general goal of reducing traffic congestion, rather than a specific Level of Service target. Second, the EIS/R considered several "build" alternatives that would achieve the stated goal. By contrast, in the present case, only Alternative 1C Modified would come close to attaining Level of Service C,[12] and all the other alternatives considered in the EIS/R were designed with a different purpose and need in mind and clearly failed to meet the Level of Service C goal. Laguna Greenbelt is inapplicable to the question whether the EIS/R is inadequate for failing to consider new alternatives designed to meet the revised statement of purpose and need, where the revision eliminated all but one of the proposed alternatives.
 
 
 104
 When a statement of purpose and need is materially changed such that the alternatives designed to satisfy the former statement of purpose and need do not satisfy the revised statement of purpose and need, new alternatives are necessary to fulfill the requirement that an EIS/R consider "an appropriate range of alternatives." See Resources Ltd. v. Robertson, 35 F.3d 1300, 1307 (9th Cir.1993).
 
 
 105
 The choice of an alternative must be made after a consideration of the relevant factors. Marsh v. Oregon Natural Resources Council, 490 U.S. at 378, 109 S.Ct. at 1861-1862. This requirement is not met where, as here, one of several relevant factors in the Draft EIS/R is elevated to dominance in the Final EIS/R, and the application of that single factor eliminates all but one of the listed alternatives.
 
 
 106
 We reverse as to this issue. Because of the elevation in importance of Level of Service C between the Draft EIS/R and Final EIS/R, the Final EIS/R did not consider a reasonable range of alternatives or make a reasoned choice after considering the relevant factors.
 
 IV
 
 107
 Executive Orders 11,988 and 11,990 require that the agency make findings that the selected alternative is the "only practicable alternative" and that damages to floodplains are minimized and damages to wetlands are mitigated to the full extent possible. As discussed above, the analysis of alternatives in the EIS/R is inadequate. These "only practicable alternative" findings are likewise inadequate. Because the "only practicable alternative" findings are based in large part on the inability of the other alternatives in the EIS/R to meet the Level of Service C goal, these "only practicable alternative" findings must be set aside.
 
 V
 
 108
 Plaintiffs allege several other defects in the EIS/R. We affirm the holding of the district court as to the following issues.
 
 A. Monterey Pine
 
 109
 The native Monterey Pine forest in Hatton Canyon is one of several native Monterey Pine populations in California. The Final EIS/R describes the effects and proposed mitigation measures of the Hatton Canyon freeway on the Monterey Pine. The Hatton Canyon freeway would destroy 21 of 70 acres of Monterey Pines in Hatton Canyon, amounting to an estimated 13,150 out of 57,400 trees. The Final EIS/R proposes replanting 20.3 acres with contract-grown Monterey pine seedlings grown from the Hatton Canyon population. The Final EIS/R concludes that this "would mitigate the impact to the native Monterey pine forest to a non-significant level through replacement of trees removed with plantings of the same genetic stock." 25 SAR 7789.
 
 
 110
 Plaintiffs contend that it is uncertain whether the seedlings will survive. However, a November 8, 1991, letter from the California Department of Fish and Game notes that "The FEIS properly proposed to re-establish new stands from the Hatton Canyon genetic stock ..." 27 SAR 8496. The EIS/R adequately proposes a mitigation plan for Monterey Pines in Hatton Canyon. We hold that the EIS/R's mitigation plan for the Monterey Pine is not arbitrary, capricious, or an abuse of discretion.
 
 B. Growth-Inducing Effects
 
 111
 Carmel alleges that the EIS/R failed to consider adequately the Hatton Canyon freeway's growth-inducing effects as required by 40 C.F.R. § 1508.8(b) and Cal. Pub. Res.Code. § 21100(b)(5). Their argument is that construction of the Hatton Canyon freeway would inherently tend to induce growth, and that the EIS must evaluate the range and scope of the potential development.
 
 
 112
 Carmel relies heavily on City of Davis v. Coleman, 521 F.2d 661 (9th Cir.1975). The City of Davis litigation arose out of the construction of a freeway interchange in the middle of sparsely populated agricultural land. As the court in that case stated, "There are so few people [near the site of the proposed interchange] that Solano County has not yet seen fit to build the road to be called Kidwell Road, which the interchange is supposed to connect to I-80." Id. at 667. The court found it to be a "simple and unmistakable" fact that the Kidwell interchange was being built to encourage development of the area. Id. Notwithstanding this fact, The Federal Highway Administration and the Division of Highways of the California Department of Public Works ("California Highway Division") issued a "Negative Declaration of Environmental Impact." This Negative Declaration served the purpose of concluding that the interchange would not have any significant environmental effects, and that there was therefore no need to prepare an EIS. The court concluded that the Negative Declaration violated the requirements of NEPA and CEQA and that the Federal Highway Administration and the California Highway Division were required to prepare an EIS.
 
 
 113
 In this case, by contrast, the EIS contains eight pages discussing the growth-inducing effect of the construction of the Hatton Canyon freeway. Most of that discussion is to the effect that the freeway construction proposed in this EIS is consistent with freeway construction presumed in a number of regional planning documents. EISs were prepared for all of those planning documents, and considered the growth-inducing effect of the construction of a road through Hatton Canyon.
 
 
 114
 The Federal defendants cite Laguna Greenbelt, 42 F.3d 517 as a more analogous case. In that case, the court found adequate and "reasonably thorough" an EIS which discussed the growth inducing effects of a proposed toll road through Orange County, an already-developed area. Likewise, in the present case, the incorporation by reference of existing growth plans for the Monterey Peninsula area, including the possibility of a Hatton Canyon highway, warrant a conclusion that the EIS/R is reasonably thorough in its treatment of growth-inducing effects, thereby satisfying NEPA.
 
 
 115
 CEQA, however, has more specific requirements. The EIR must discuss growth-inducing effects. Cal. Pub. Res.Code. § 21100(b)(5). That discussion must include a detailed statement including specific items set forth in CEQA Guidelines § 15126(g). The Final EIS/R's discussion of growth-inducing effects is fairly extensive, but it does not discuss the potential for economic or population growth, except by reference to a panoply of planning documents, including the Carmel Valley Master Plan and the Monterey Peninsula Area Plan. These documents do not specifically itemize economic and population growth that would be expected to result from construction of the Hatton Canyon freeway. However, they do specifically include construction of the Hatton Canyon freeway in their growth plans, and do discuss overall growth targets and limits. This information is adequate to satisfy CEQA's requirements.
 
 
 116
 We hold that the EIS/R's discussion of growth-inducing effects is adequate under NEPA and CEQA.
 
 VI
 
 117
 The Equal Access to Justice Act, 28 U.S.C. § 2412(d), provides that in a civil action brought by or against the United States, the prevailing party may be awarded costs and attorney's fees, provided the court finds that the position of the United States was not substantially justified and that there are no special circumstances that would make an award unjust. 28 U.S.C. § 2412(d)(1)(A).
 
 
 118
 To be a prevailing party, a party need not prevail on all issues. Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark, 720 F.2d 1475 (9th Cir.1983), cert. denied, 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984). Carmel is the prevailing party on the issues of wetlands mitigation, cumulative impacts, and consideration of alternatives, and is eligible to recover attorney's fees on those issues, provided the position of the United States is not substantially justified and there are no special circumstances. The claims asserted by Carmel are independent and distinct assertions of error in the EIS/R, rather than alternative theories of recovery. The fact that Carmel is the prevailing party on some issues does not render it the prevailing party as to the entire case.
 
 
 119
 The test for substantial justification "is one of reasonableness." Animal Lovers Volunteer Ass'n, Inc. v. Carlucci, 867 F.2d 1224, 1225-1226 (9th Cir.1989). The connotation "most naturally conveyed by the phrase [is] ... justified to a degree that could satisfy a reasonable person." Id. (quoting Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988)). Here, neither the Government's position on wetlands mitigation nor on consideration of alternatives would satisfy a reasonable person. The Government's position was not substantially justified. Likewise, there are no special circumstances that would make an award of fees unjust. Carmel is entitled under the Equal Access to Justice Act to recover attorney's fees for the wetlands and consideration of alternatives issues, including Executive Orders 11,988 and 11,990.
 
 
 120
 Our holding on the cumulative impacts issue is limited to a remand to the district court to determine whether the Final EIS/R (including the Carmel Valley Master Plan EIR's cumulative impacts analysis) satisfies the criteria originally set forth by the Fifth Circuit. Consequently, we are unable to say whether or not the Government's position is unreasonable on that issue. We decline to grant attorney's fees on the cumulative impacts issue.
 
 
 121
 The California attorney's fee statute, Cal.Civ.P.Code § 1021.5, provides that a court may award attorney's fees to a "successful party" in an action where there is a significant benefit conferred upon the public, the "necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such to make the award appropriate," and justice indicates that the fees should not be paid out of the recovery, if any. The objective of this "private attorney general" doctrine is to encourage suits effecting strong public policy by awarding attorney's fees to those whose successful efforts obtain benefits for a broad class of citizens. Hull v. Rossi (Miller), 13 Cal.App.4th 1763, 17 Cal.Rptr.2d 457 (1993). Carmel is a "successful party" on several issues in this action, the suit involves important public rights, and there is no monetary recovery. Therefore, an award of attorney's fees to Carmel on the wetlands and consideration of alternatives issues is appropriate under the California statute as well.
 
 
 122
 It appears from the record that all plaintiffs have been represented throughout the proceedings in the district court and on appeal by the law firm of Shute, Mihaly and Weinberger. Plaintiffs are entitled to a single attorney's fee incurred in the district court and on appeal. Judgment for this fee should be allocated 50% to Federal defendants and 50% to State defendants. We remand to the district court the determination of a reasonable attorney's fee for both trial and appellate legal services. The award is solely for legal services reasonably and directly related to the wetlands and consideration of alternatives issues, including Executive Orders 11,988 and 11,990.
 
 VII
 
 123
 We reverse the district court's grant of summary judgment in favor of defendants on the issue of the Final EIS/R's analysis of wetlands in Hatton Canyon. We also reverse as to the issue of the Final EIS/R's consideration of alternatives in light of the change in statement of purpose and need between the Draft and Final versions of the EIS/R. We reverse the decision of the district court as to these issues and the associated holding with respect to Executive Orders 11,988 and 11,990. Plaintiffs are entitled to an attorney's fee on these issues.
 
 
 124
 We adopt the Fifth Circuit's criteria for analyzing cumulative impacts. Because we are unable to examine the Carmel Valley Master Plan EIR's cumulative impacts analysis, as incorporated by reference into the Final EIS/R, for the light it might shed on the adequacy of the Final EIS/R's analysis, we reverse and remand this issue to the district court. We do not award attorney's fees on this issue.
 
 
 125
 We affirm the decision of the district court as to all other issues.
 
 
 126
 AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 127
 TROTT, Circuit Judge, dissenting.
 
 
 128
 Then I witnessed the torture of Sisyphus, as he wrestled with a huge rock with both hands. Bracing himself and thrusting with hands and feet he pushed the boulder uphill to the top. But every time, as he was about to send it toppling over the crest, its sheer weight turned it back, and once again towards the plain the pitiless rock rolled down. So once more he had to wrestle with the thing and push it up, while the sweat poured from his limbs and the dust rose high above his head.
 
 
 129
 Homer, The Odyssey, E.V. Rieu and D.C.H. Rieu Trans., Penguin Classics (1991).
 
 
 130
 * THE PROJECT GOAL AND ITS ALTERNATIVES
 
 
 131
 In holding the Final EIS/R deficient because "it failed to consider reasonable alternatives," the majority concludes that the important "purpose and need" section of that document is materially and thus fatally different from its articulation in the Draft EIS. I respectfully disagree. The record simply does not support the conclusion that the statement of the problem in the Draft EIS/R materially changed between that document and the final product. Reading the two relevant documents in their entirety and in context demonstrates that everything material to the purpose and need identified in the final product and used to devise and examine alternatives, as well as needed to generate relevant and informed public comment and input, was explicitly presented in the Draft and in other relevant documents that contributed to this dynamic process. The predicate required by NEPA for informed decisionmaking was certainly present. As Judge Williams correctly said in the district court, "Defendants did not pull the LOS C requirement out of the air." Let me elaborate.
 
 A.
 THE FINAL EIS/R
 
 132
 The Purpose and Need section of the Final EIS says that
 
 
 133
 The purpose of the project is to relieve current traffic congestion, lessen emergency vehicle response time, reduce crossing conflicts at local intersections and driveways, improve safety, ameliorate air quality, and bring the rural road character back to the local area. Improvement for congestion relief to the area should provide capacity to meet traffic service needs for the next 20 years at Level of Service C in order to be a reasonable expenditure of public funds. Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the local street system.
 
 
 134
 FEIS I:1.
 
 
 135
 What the plaintiffs complain about is the inclusion in this section of a level of service target (LOS), specifically level C, which they suggest reflects conspiratorial bad faith on the part of the defendants designed to enable the Federal Highway Administration and the State Department of Transportation disingenuously to reject (as unreasonable) alternatives preferred by others. The plaintiffs claim in their briefs that LOS C as a goal of the project was (1) "belated," (2) conjured up after-the-fact in a lawless attempt to cook the results of the study, and (3) improperly biased in favor of the Hatton Canyon Freeway alternative. Reading the Draft EIS/R and the entire record, however, dispels these rash allegations of bad faith as well as what amounts to a charge by the plaintiffs of "purpose and need ambush."
 
 B.
 THE DRAFT EIS/R
 
 136
 Under the general heading "Purpose and Need," the very first sentence of the 1986 Draft says, "The purpose of the proposed project alternatives is to improve the capacity of Highway 1...." The second sentence says, "Project alternative solutions would provide for improved level of service for through traffic on Highway 1 ...." (emphasis added). The improvements sought are then described explicitly as improvements in (1) accident rates, (2) congestion at street intersections, (3) travel time, (4) air quality, (5) accessibility and safety for vehicles, bicyclists and pedestrians, (6) improved highway capacity, and (7) more consistency with the Monterey County General Plan.
 
 
 137
 One page after this general statement of purpose and need, the Draft contains a section entitled "1.3 Problem Definition." In this important section, the Draft opens by pointing out that
 
 
 138
 [t]he existing Highway 1 in the project area does not effectively serve present traffic. The principle problem is lack of capacity.... The capacity of the existing highway has not kept pace with the increased travel demands. The Monterey County Transportation Commission has established LOS [level of service] C as the minimum acceptable level of service. Level of Service [LOS] is an indication of a road's performance based upon an evaluation of driving conditions with six performance levels ranging from "Ideal" (LOS A) to "Force Flow" (LOS F).
 
 
 139
 Based upon hourly traffic volumes taken in the project area, the existing highway is operating at LOS E for approximately 14 hours per day. At this level of service, the highway is operating at or near capacity with a very unstable traffic flow. It is not possible to maintain consistent speed and traffic may be completely stopped momentarily. Peak hour and tourist season flows exceed these conditions with stop and go traffic being the norm....
 
 
 140
 The traffic forecasts indicate a continued increase in congestion and delay on Highway 1 resulting in "forced flow" [LOS F] conditions for longer periods during the day unless there are capacity improvements. (Emphasis added).
 
 
 141
 The Draft then lists the various levels of service in terms of their traffic flow capacity. These levels were not ad hoc requirements made up for this project, but active "industry standards" well understood by those who engage in the planning and construction of highways. In 1984 the American Association of State Highway and Transportation Officials promulgated a design policy which in turn was incorporated into Federal Highway Administration Regulations at 23 C.F.R. § 625.4(a)(1). This policy, in place throughout this process and a matter of public record, says that although conditions may occasionally require the approval of LOS D, "such use should be rare and at least level of service C should be strived for."
 
 
 142
 Level A is "free flow ... with speed controlled by driver desires." Level B is "in the zone of stable flow" somewhat restricted but where drivers still have "reasonable freedom" to select their speed. Level C is "still in the zone of stable flow," but with maneuverability and speed somewhat restricted. Level D "approaches unstable flow, with tolerable operating speeds being maintained though considerably affected by changes in operating conditions." Finally, LOS E and LOS F are flows characterized by "stoppages," what the ordinary driver refers to as periodic "parking lots." LOS E and LOS F certainly could not be taken to be project goals because they qualitatively describe the problem this project is supposed to fix. LOS C is nothing more than industry shorthand for what the draft's Purpose and Need section describes as the project's goal: a flow of traffic that is uncongested, serviceable, and safe.
 
 
 143
 Chapter II of the 1986 Draft is entitled "Proposed Action and Project Alternatives." Not surprisingly, it begins by stating that the objective is to provide "additional capacity" to Highway 1. Chapter II then describes and discusses five viable alternative proposals to accomplish this goal, plus four variations for Alternative 1, the Hatton Canyon Alignment. Alternatives 3, 4, 6 and 7 each involve widening and improving existing Highway 1 to one degree or another. Moreover, the draft identifies five alternatives already thoroughly considered but rejected as inadequate to achieve the state's goals: These alternatives are described as (1) the Hatton Loop, (2) a freeway on the existing alignment, (3) a "Down-Scoped" Hatton Canyon alternative design, (4) a Carmel Valley Road separation, and (5) high occupancy vehicle (HOV) lanes. In the main, these alternatives were dismissed either because of cost, lack of impact on the traffic-flow problem, or other environmental concerns. The Draft points out that all of these alignments and alternatives arise from consideration beginning in the 1950's of a "broad spectrum" of possibilities.
 
 C.
 DISCUSSION
 
 144
 In the light of the content of the Draft EIS/R, the majority's predicate conclusion that supports their holding is simply wrong. Read as a whole, the Draft itself more than adequately provided a basis for devising and discussing the alternatives for solving the stated problems, and it unquestionably put any fair-minded person on notice that LOS C was not only on the table, but the preferred solution. LOS C occupies a front row, center seat position in the description of the flow problem under Chapter I, "Problem Definition," as "the minimum level of acceptable service." The majority attempts unconvincingly to brush this aside.
 
 
 145
 Furthermore, Monterey County, whose Transportation Commission devised this goal, is the political subdivision of California with jurisdiction over the area where this freeway is to be constructed, not an interloper with no standing. Thus, the County's Transportation Commission's goal takes on special significance. How LOS C could be overlooked by anyone engaged in this dynamic process as a qualitative project goal is beyond my comprehension. Given the circumstances of this case, the fact that LOS C was under the heading "Problem Definition" rather than "Purpose and Need" is absolutely of no moment. The record shows not only that this project goal was not overlooked, but that it was explicitly understood by everyone concerned long before the Final EIS/R as precisely the qualitative standard to which this project aspired. In letter after letter to the state and federal authorities charged subsequent to the 1986 Draft with preparing the Final EIS/R, the interested parties acknowledge and discuss LOS C as the stated goal of this project, especially after 1987 when the Preferred Alternative, Alternative 1C, was published by the Department of Transportation. The California Coastal Commission, for example, acknowledged LOS C as a project goal in its 39-page Staff Report dated 9/22/88, revised 11/22/88: "The purpose of the proposed project is to improve the capacity of Highway 1.... Monterey County Transportation Commission has established Level of Service C as the minimum acceptable level of service."
 
 
 146
 Perhaps more telling on this issue, however, is the overwhelming evidence in the record that appellants' own experts, William Smith Associates (WSA), were fully cognizant before the publication of the Final EIS/R that LOS C was the project's goal. In their Working Paper dated Revised July, 1991, over and over they refer to LOS C as the acknowledged goal, but suggest that possibly it need not be so rigid. For example, under the heading "Environmental v. Traffic Goals," the report in its exhaustive summary says, "Cal-Trans has referred to the General Plan goal of LOS C as refining the Hatton Canyon Freeway in order to meet the [Monterey] County goal." Under "CalTrans Final EIS Status and Findings," WSA says, "Alternative IC (a variation extending the freeway on a new alignment south of the Carmel River) was selected as the Preferred Alternative [in 1987] based largely on the assertion that it was the only alternative that would provide acceptable Level of Service (LOS C, the stated goal of Monterey County)." Under WSA's discussion of "Alternative 1-Widening Highway 1," the report talks about "a completely acceptable LOS C;" and # 10 in the report's "Summary of findings" reads as follows:
 
 
 147
 Whereas the maintenance of Level of Service (LOS C) is a desirable objective from the standpoint of traffic service and mobility, and is a current policy objective of some public agencies such as Monterey County, this threshold is seldom attained in every location in any urban area as large as the Monterey County/Pacific Grove area. The attainment of LOS C is not an inflexible institutionalized mandate.
 
 
 148
 In short, no harm, no foul. Everyone knew well in advance of the final product that LOS C was the goal for this project, and to claim now that they did not, or that the placement of LOS C in the Final EIS/R amounts to a material variance, is thoroughly impeached by the record. Not everyone agreed that LOS C was a perfect goal, but no one was misled as to where this project was heading. Had LOS A or B appeared in the Final EIS/R, the plaintiffs would have a better argument, but that did not happen. In other words, the allegations amounting to claims of ambush are completely unfounded.
 
 
 149
 There is a contextual aspect of this issue that also significantly undercuts the plaintiffs' claim of ambush, an aspect not adequately developed in the majority's opinion: the Final EIS/R was the end result of what can fairly be described as a lengthy work in progress. Borrowing heavily from the State's uncontroverted brief, which is corroborated in Chapter X of the Final EIS/R, I shall explain as succinctly as possible.
 
 
 150
 This project began in 1947 when California's Department of Transportation recognized a serious traffic congestion problem along Highway 1. In 1953, the Department formally designated the affected area as a "freeway" which permitted it to be rebuilt as such. This designation raised a storm of protest, however, and was formally opposed by the City of Carmel. The controversy generated by the idea of a freeway close to Carmel caused the Department to look for alternatives, and the Hatton Canyon Freeway alternative thus surfaced in a Traffic Report in September of 1953. This alternative was formally supported by Carmel in a 1954 resolution which says, "NOW, THEREFORE, BE IT RESOLVED that the City Council reaffirms the feeling expressed in Resolution No. 1373 opposing the location of a freeway along Highway # 1, and strongly urges that every possible consideration be given to the Hatton Canyon Route as much more desirable." It is fair to say that from that time until the present, over 40 years, this issue in great detail has been under almost constant consideration by everyone with an interest in it.
 
 
 151
 In February, 1957, Monterey County formally entered into a Freeway Agreement with the State Department of Transportation embracing the Hatton Canyon alternative. The Department and others then devoted considerable attention to the effect of the project on the Monterey pine. Numerous alternatives were proposed to accommodate this distinctive ecological interest.
 
 
 152
 During the 60's and 70's the project plodded along, sometimes forward, sometimes backward as various concerns raised by the project were batted back and forth by interested individuals and groups. At times the City of Carmel was for, and then against, the Hatton Canyon alternative-depending on the interests with the upper political hand in city government.
 
 
 153
 In 1978, the project seems to have gone dormant for a lack of money at the state level, and it went on the back burner. In 1982, the Department tentatively decided to scrap the Hatton Canyon freeway, among other reasons because of the controversy it had generated. However, the plan to rescind the freeway was greeted with considerable opposition, notably from Carmel, the City of Monterey, the Monterey County Transportation Commission, and the Sierra Club. The Sierra Club went on record with this statement: "We urge the California Transportation Commission not to abandon its Hatton Canyon right of way. We further urge that Cal-Trans reject any proposals to widen the present Highway 1 between Rio Road and Ocean Avenue. Such widening would represent a 'Band-Aid' approach to congestion problems which have reached crisis dimensions in the last 10 years." Everyone interested continued to acknowledge the problem, but a consensus solution remained elusive.
 
 
 154
 The Department held a hearing on the proposed rescission. Speaking against it and in favor of the Hatton Canyon freeway was the City of Carmel. Carmel won, and the Department included the project in its 1983 Improvement Program, for construction in 1988.
 
 
 155
 What followed is quite significant. Both the Department and the Federal Highway Administration commenced wide-scoped initiatives to present this project to the public through informational meetings and to secure local input. Citizens advisory groups cropped-up, and the Department engaged in numerous studies for two years in preparation for this Draft EIS/R. The subjects of these impact studies and inquiries included Monterey pines, wetlands, plant species too numerous to list, geological hazards, endangered species, wildlife, vegetation, seismic hazards, traffic analysis, noise, historic property, archeology, visual impacts and aesthetics, and hydrology. Various alternatives were considered and rejected along the way to the Draft EIS/R, including widening Highway 1 and attacking the problem with a different building configuration known as the Hatton or Carmel Loop. In fact, the project was awash in alternative proposals.
 
 
 156
 Out of all of these extensive studies, investigations, contributions, and proposals of alternatives from the interested parties came the Draft EIS/R in 1986. It was filed with the State Clearinghouse and noted in the Federal Register. The Department then held an extensive public hearing on the draft, and every public entity involved declared itself as supporting the Hatton Canyon alignment.
 
 
 157
 Eight months later, on June 22, 1987, after consideration of the massive input it had received, the Department took a step that is critical in analyzing the plaintiffs' ambush claim: the Department issued an interim report indicating its Preferred Alternative recommendations for the project, Alternate 1 C. In this comprehensive document, prepared after a public hearing in Carmel on December 11, 1986, the Department specifically identified LOS C as the project goal:
 
 I. Alternates
 A. Selected Alternate
 
 158
 Alternate 1C is selected for construction. It is the only practical plan that provides acceptable traffic service through the project area for a reasonable period of time ...
 
 B. Other Alternates
 
 159
 1. [No build].
 2. Alternate 3. [Add a lane to Highway 1].
 3. Alternate 4. [With four variations]
 [Widen the existing two-lane conventional highway to four lanes].
 4. Alternate 6.
 [Widen the existing two and four-lane conventional highways to six lanes].
 5. Alternate 7. [Combine Alternates 1 and 7].
 
 II. Transportation Problem
 A. Criteria
 
 160
 Level of Service is a qualitative measure used to evaluate traffic operational conditions....
 
 
 161
 The Monterey County Transportation Commission established Level of Service C as the minimum acceptable for roads within Monterey County.
 
 
 162
 The American Association of State Highway and Transportation Officials released "A Policy on Geometric Design of Highways and Streets" in 1984. That policy notes that Level of Service C is appropriate for the proposed new freeway or for maintaining the existing arterial highway. A minimum Level of Service D is appropriate for the existing highway if it becomes a Collector Street (when through traffic is on new freeway).
 
 
 163
 A period of 20 years has been used as the basis for traffic analysis and project design. Traffic for that period can be estimated with reasonable accuracy. Radical changes in land use or traffic patterns are not expected.
 
 
 164
 Note: Future traffic volumes would exceed highway capacity by unrealistic amounts with "no build" or Alternate 3. Analysis of future traffic conditions is impractical for these plans and they have not been included in traffic summaries with other alternates.
 
 B. Existing Controls
 
 165
 There are four major areas along the existing highway within the project limits that frequently operate at or near capacity. These sections are controlled by intersections at Rio Road, Carmel Valley Road, Ocean Avenue and Carpenter Street. Operation near the Carmel Valley Road intersection is also limited by narrow roadways.
 
 D. Available Options
 
 166
 There are three basic methods that could improve the traffic operation.
 
 
 167
 1. Enlarge the existing conventional highway system.
 
 
 168
 2. Convert the existing conventional highway to a freeway.
 
 
 169
 3. Remove through traffic to another facility and leave the existing highway for local traffic.
 
 
 170
 Enlarging the existing highway facility is represented by Alternates 3, 4, 4 Modified and 6.
 
 
 171
 Converting the existing highway to a freeway was proposed in 1955 at a Public Hearing before the California Highway Commission. It was determined that this plan was unacceptable to the community. Development along the existing highway in the following 30 years has now made it impractical to convert it to a freeway.
 
 
 172
 Removing through traffic from the local traffic is represented by the selected alternate (1C).
 
 
 173
 The only area now available to construct a new highway is through Hatton Canyon. This highway route was adopted by the California Highway Commission in 1956. Adjacent land has since been extensively developed. A significant shift in highway location is impractical because of the City of Carmel-by-the Sea on the west and the Peninsula ridgeline on the east.
 
 
 174
 Once again, LOS C occupies a prominent role in this process.
 
 
 175
 Another round of comment on the Preferred Alternative followed, culminating two and one-half years later on October 25, 1989 with the publication of the first Final EIS/R by the Department. In the interim, the Department as required by law prepared a written Reevaluation of the project to assess changes that had taken place since the circulation of the Draft and to revise the Draft as appropriate to accommodate the extensive public and official input that had been received.
 
 
 176
 But this gauntlet was not close to over. The FHWA had yet to act. One must not lose sight of the fact that this was a joint federal and state project requiring compliance with the environmental laws of both. Before the FHWA approved the Final EIS/R, it consulted with (1) the federal Environmental Protection Agency, who was responsible for NEPA enforcement, (2) the Army, which had jurisdiction over the wetlands, and (3) the United States Department of the Interior, Fish and Wildlife Service, responsible for the Endangered Species Act. Furthermore, the defendants received, considered, and rejected during this period plaintiffs' WSA submission previously referred to and its suggestion of highway-widening alternatives. All of this delayed federal approval of the final product until October 7, 1991 when the Final EIS/R was certified by the Department, followed by extensive public and official comment, followed by approval of the project by the Commission on November 27, 1991. In light of all of this, the majority's statement that the Final EIS/R "should have presented a highway-widening alternative that was designed to meet-or aspired to meet-the Final EIS/R's narrower statement of purpose and need" is, with all respect, more than questionable.
 
 
 177
 If this extensive process amounts to an ambush or a failure of the responsible agencies to take a hard look at the relevant environmental concerns as they worked toward a solution to the traffic problems everyone in the world admits exist, or if those interested in the project did not know what to comment on, then Wonderland is real. To undo this remarkably detailed process based on a groundless claim of surprise by the plaintiffs as to the goal of LOS C is an absurdity of the profoundest kind. This entire case history is the story of an informed and painstaking search for viable alternatives to solve a major traffic congestion problem with as little damage to the environment as possible. To order everyone now to go back and look for more alternatives adds a new episode to the travails of Sisyphus. The majority's claim that the agencies "failed to consider reasonable alternatives" is flatly irreconcilable with the record. I cannot conceive of a reasonable alternative that has not been considered to death.
 
 
 178
 The plaintiff's claim that LOS C's appearance in the Final EIS/R is a surprise betrays on this record a desire not just to make sure that the procedural steps in this project were properly followed, but merely to upset the appropriate decisionmakers' substantive conclusion in favor of the Hatton Canyon freeway. This lawsuit is patently and inappropriately outcome-driven, and the City of Carmel has been a moving sharpshooter as the process has unfolded. The Government's allegation that Carmel has "reversed its position on the Hatton Canyon Freeway five times" is borne out by the record. As noted in the Draft EIS/R, the City of Carmel requested realignment of Highway 1 to Hatton Canyon in 1953. In 1970, the City of Carmel asked that the Hatton Canyon alternative be expedited, and in 1971 that the California State Transportation Commission give it a high priority. As late as 1986, after the Draft EIS/R was circulated, the City of Carmel supported Alternative I, the very same alternative it now opposes. I quote a letter dated January 7, 1987 from City Administrator Douglas J. Schmitz to Gary Ruggerone of California Transportation:
 
 
 179
 The [Draft EIS/R] is thorough in its analysis of the primary route and the alternatives.
 
 
 180
 On 6 January 1987, the City Council of the City of Carmel-by-the-Sea considered the Draft Environmental Impact Statement for the Highway One Improvement Project. With one abstention, the City Council unanimously supports Alternative 1 (Hatton Canyon) and Sub-alternative 1C for the southern portion of the route.
 
 
 181
 It was not until March 1990 that the City changed its mind.
 
 
 182
 The Sierra Club finds itself in a similar position, having originally submitted a comment letter supporting the Hatton Canyon alignment as "the only logical long term solution." Two years later, they rescinded their approval in principle, stating that "we no longer endorse our January 7, 1987 draft E.I.S. comments."
 
 
 183
 The point of these observations about the shifting positions of the litigants is not to castigate anyone for changing one's institutional mind, but to indicate that this was a complicated work in progress during which everyone had an ample opportunity to participate in the "hard look" required of the project's proponents. But substantive disagreement with the Hatton Canyon freeway is not a basis under NEPA on which this process can be overturned. No matter how many times this limitation on our jurisdiction is pointed out to litigants and lawyers, it is ignored time and time again.
 
 
 184
 I am unable to fathom on this enormous record spanning four decades why anyone responsible for public funds suddenly in the Final EIS/R would pursue this expensive and consequential project with a target level of service of D, E, or F in mind, i.e., unstable traffic flow at best and stoppages at worst. On this record, LOS C is the only one that makes sense as a goal. To quote from the Final EIS/R, "Alternative 1C Modified [which includes LOS C] provides reasonably good service for both through and local traffic for at least 20 years.... None of the other alternatives prevent excessive traffic delays, particularly at the [sic] Carpenter Street." The report also says that based on existing studies, Alternative 1C would result in 3000 less traffic accidents over a 10-year period than any other alternative, which includes 500 less injuries and 10 less deaths. Alternative 1C is the only Alternative consistent with the requirements of the California Coastal Act and the Monterey County Local Coastal Plan. Thus, I can discern nothing arbitrary or capricious or illegal about its selection by these decisionmakers. In effect, LOS C is just another way of saying exactly what the Draft EIS/R Purpose and Need section says: Our goal is to free up traffic. To aim for LOS D or less, which seem to describe the very problem sought to be ameliorated, would seem irresponsible and wasteful.
 
 
 185
 Attacks like the plaintiffs' on the motives and integrity of governmental agencies are not new, nor are they uncommon. The District of Columbia Circuit confronted a similar baseless charge in City of Grapevine v. Dep't of Transp., 17 F.3d 1502 (D.C.Cir.1994), cert. denied, 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994). In that case, a different set of plaintiffs made the same sort of goal-oriented bad faith claims. Wisely, the court said it would "pass over the facile implication that the FAA harbored an improper motive for changing the statement of purpose in the FEIS." Id. at 1506-1507. The plaintiffs' claim here is nothing more than a similar distraction. They have not unearthed anything that calls into question the bona fides of those responsible for this demanding and unrewarding process.
 
 II
 THE WETLANDS
 
 186
 (more of the same)
 
 
 187
 Appellants claim that the Final EIS/R understates the impact of this project on some 12 acres (or slightly more) of wetlands, and that the Final EIS/R's approach to the mitigation of such an impact was "inaccurate," "misleading," and "not specific." I respectfully believe that the alleged indicators of such alleged defects pointed to by the appellants-either individually or in the aggregate-fail to support such claims.
 
 
 188
 The key to evaluating the wetlands issue raised by the plaintiffs is to use the right approach. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson v. Methow Valley Citizens, 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). "NEPA merely prohibits uninformed-rather than unwise-agency action." Id. at 351, 109 S.Ct. at 1846. Based on this principle, for example, NEPA would not have been violated in this matter if the agencies, after complying with the Act's procedural prerequisites, had decided that the benefits of the proposed freeway justified this project notwithstanding a significant loss of existing wetlands area. See id. at 351, 109 S.Ct. at 1846-1847.
 
 
 189
 Our precise marching orders as a reviewing court as to the discussion of the mitigation of environmental harm, as spelled out by the Court in Methow Valley Citizens, are as follows:
 
 
 190
 There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.... It would be inconsistent with NEPA's reliance on procedural mechanisms-as opposed to substantive, result-based standards-to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.
 
 
 191
 Id. at 352-353, 109 S.Ct. at 1847. See also Laguna Greenbelt, Inc. v. United States Dept. of Transp., 42 F.3d 517 (9th Cir.1994) ("NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated."). It would be a mistake, therefore, for us to approach the wetlands issue asking whether the proposed mitigation measures meet anyone's substantive expectations or to base our evaluation of this EIS on whether the proposed mitigation features of it amount to a "fully developed plan."
 
 
 192
 Thus, we look at the Final EIS's handling of the wetlands aspect of this project and ask only (1) if it adequately arrays for the public and for the decisionmakers sufficiently detailed information concerning significant environmental impacts on the basis of which an informed decision-including mitigation-can be reached, and (2) does its presentation of the relevant wetlands information serve NEPA's "action-forcing" purpose? See id. at 349, 109 S.Ct. at 1845. In other words, does it contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences?" California v. Block, 690 F.2d 753, 761 (9th Cir.1982).
 
 
 193
 Chapter IV of the Plan is entitled, "Environmental Consequences." No. 3 of this Chapter tells the reader that Alternatives 1B and 1C Modified will "remove" approximately 11.95 acres of wetlands. "Remove" means to get rid of. I do not understand how the impact of this alternative on wetlands can be said by the appellants to be ambiguous or understated. To quibble at the margins about the precise acreage is irrelevant because the freeway is going to wipe out or materially rearrange virtually all the wetlands in its path. This statement surely informs the public and the decisionmakers of the environmental consequences of this Alternative, as it does in turn about all the others; and it is certainly "action-forcing." A chart is present in the Plan comparing the environmental consequences of the numerous Alternatives against each other. Anyone reading the document cannot miss this relevant information. The document itself underscores its importance, and in so doing it appropriately shifts from damage to the wetlands to mitigation of the same:
 
 
 194
 Riparian wetlands are identified in the Greater Monterey Peninsula Area Plan as a limited habitat, and the Carmel River riparian is considered to be of "critical importance" in the prevention of riverbank erosion. The loss of an additional 11 to 12 acres of riparian wetlands under Alternative 1 is considered significant.
 
 
 195
 Accordingly, the Plan then describes "Proposed Mitigation Measures," described clearly and explicitly as "conceptual." The most significant aspect of these measures is a commitment to [replace] riparian wetland habitat on at least a 1:1 basis. The proposed mitigation would compensate for acreage impacts to existing palustrine wetland and palustrine emergent resources and would fully meet the FWS [Fish and Wildlife Service] Resource Category 2 Goal of no net loss of in-kind wetland habitat values.
 
 
 196
 This conceptual Mitigation Plan, which must be read in its entirety to get its full impact, calls for the establishment during freeway construction of an ESA, or a fenced-off environmentally sensitive area, "which the contractor would be prohibited from using ... for any purpose." The Mitigation Plan then makes detailed provisions for the replacement and enhancement of both "on-site" and "off-site" wetlands. These provisions go so far as to specify the types of trees-eight different kinds-to be planted in the affected areas and even require that the areas designated as sources for the cuttings "not be 'clear cut,' " and that only "insect and disease free willow cuttings would be used." Moreover, after approval by the FWS, the off-site riparian wetland replacement plantings are scheduled to be "in place at least one year prior to the start of construction activities for the proposed highway improvement." Management of this restoration plan is assigned to the Monterey Peninsula Water Management District under a Cooperative Agreement with CalTrans, to be monitored for five years with the preparation of annual reports. Finally, the Mitigation Plan includes "a contingency plan which will identify additional mitigation measures and/or sites that will be utilized should all or part of the proposed mitigation fail," all of this at a cost of $850,000.
 
 
 197
 Even with all of this detail, however, the Final EIS/R pulls no punches when it sums up what is happening and why:
 
 
 198
 The proposed mitigation measures are intended to re-create forested riparian wetland habitat similar to that which would be directly affected by the highway construction. With the replacement plantings at greater than a 1:1 ratio, and the start of the off-site and most of the on-site replacement plantings at least one year prior to the start of highway construction, the proposed mitigation would insure no loss of riparian wetland acreage or habitat value.
 
 
 199
 Even with proposed mitigation, the impact to riparian wetlands from Alternative 1 is considered significant. The riparian wetland, with associated upland in Hatton Canyon can not be duplicated to fully provide in-kind replacement of habitat values.
 
 
 200
 There are no practicable design variations of Alternative 1C Modified that would reduce or avoid wetland impacts. The width of Hatton Canyon is less than the width necessary for the roadway. Further cut into the east wall of Hatton Canyon could result in a slight reduction in wetland impacts, however, the additional cut would require the taking of additional acres of Monterey Pine Forest, all of the rare Hickman's onion preserve, and several residences. The substantial impact of this design variation, to preserve a minor isolated portion of riparian wetland is not practicable.
 
 
 201
 South of Carmel Valley Road, the canyon opens up to the Carmel Valley. At this location, the width necessary for the Carmel Valley Road Interchange and associated ramps are restricted by the existing highway on the west and the Carmel Rancho Shopping Center on the East. The portion of the Hatton Canyon drainage (and associated riparian wetland) would be covered by the fill required for the interchange and ramps.
 
 
 202
 At the Carmel River, the bridge on the new alignment has been designed with a minimum of disturbance to the existing river levees. The bridge will also be designed with the maximum possible span to minimize the number of pilings required in the Carmel River. No further design variations are available to further reduce wetland impacts at the Carmel River.
 
 
 203
 A Wetlands Only Practicable Alternative Finding has been prepared for Alternative 1C Modified (See Exhibit K).
 
 
 204
 Exhibit N to this document is a letter from the FWS dated October 30, 1989 which approves the Mitigation Plan in concept as adequate to replace the lost habitat but pointing out that "formal approval must wait until a detailed plan is completed." Noteworthy in this letter is a suggestion for a contingency plan, a suggestion which was later adopted in the Mitigation Plan itself.
 
 
 205
 A number of important things literally leap off the pages of the Final EIS/R.
 
 
 206
 First, the impact on the wetlands is adequately stated.
 
 
 207
 Second, anyone interested in the project and intending to comment was surely informed as to all of its environmental consequences.
 
 
 208
 Third, the document is extraordinarily sensitive to the wetlands, providing for a 1:1 replacement ratio including using insect-free cuttings.
 
 
 209
 Fourth, the plan is absolutely flexible and proposes to respond to any changes or unseen contingencies.
 
 
 210
 Fifth, the wetlands impact is plainly measured against all the alternatives, and a reasoned judgment rendered in the required finding of "Only Practicable Alternative," appearing as Exhibit K. In essence, it was the informed judgment of the decisionmakers that the other alternatives simply do not deliver the transportation goals of the project, and that "there are no practicable design variations of Alternative 1C that would reduce or avoid wetland impacts."
 
 
 211
 Sixth, and here is some irony, photographs of the area taken before this project began show that some of the wetlands now under the microscope did not even exist in 1950.
 
 
 212
 Accordingly, I find no merit in plaintiffs' claims that there is currently more wetland acreage in the affected area because of the Loma Prieta earthquake than was considered in the process. The Mitigation Plan's admirable commitment to a 1:1 restoration ratio in concert with the contingency provisions and management program are more than adequate to take care of any changing conditions. The Mitigation Plan "ensures that important effects will not be overlooked or under-estimated only to be discovered after recourses have been committed or the die otherwise cast." Methow Valley Citizens, 490 U.S. at 349, 109 S.Ct. at 1845. This is also true of plaintiffs' claim that the information regarding the wetlands is now stale. Because the Mitigation Plan is conceptual, flexible, and contingent, it will necessarily and properly deal with evolving conditions. Plaintiffs complain that the plan is not specific enough, but its genius is that it is responsive and flexible. Moreover, the permit process will iron out any wrinkles it may have. In any event, the process certainly satisfies Methow Valley Citizens ' requirement that a fully developed plan be presented in sufficient detail to address and to evaluate the environmental consequences of a project.
 
 
 213
 Again, one cannot help but glean from plaintiffs' arguments that the core of their disagreement with this project, as I mentioned earlier, is the final determination of the decisionmakers to build this freeway, and that the plaintiffs' alleged procedural complaints when closely scrutinized turn out to be simply sheep in wolves' clothing.
 
 III
 CUMULATIVE IMPACTS
 
 214
 The district court's Order gives us a significant key to deciding whether the cumulative impacts of this project have been considered as required by law. The district court said, (1)"Plaintiffs have failed to identify any other actions that might have an impact on the Monterey pine forest affected by this project"; and (2) "Plaintiffs have not identified any other actions which might have an impact on wetlands. Absent such actions, the EIS need not discuss cumulative impacts." Accordingly, with the burden on the plaintiffs to show a violation of NEPA in this regard, summary judgment was proper given no showing of specific cumulative impacts on either the pine forest or the wetlands.
 
 
 215
 Nevertheless, the final EIS/R did adequately and generally discuss cumulative impacts regarding the pine forest, stating that
 
 
 216
 The native Monterey pine forest in Hatton Canyon is part of the largest of the three remaining native Monterey pine populations in California. The Monterey population is rapidly being reduced in size and integrity by the urbanization of the area. The extensive removal of native Monterey pines without replacing them, suppression of natural fires, and the extensive use of Monterey pines of unknown genetic origin in landscaping have all contributed to the loss of the native populations. The introduction of Monterey pines of unknown genetic origin has the potential of producing mixed populations that are more vulnerable to insect attacks, disease and environmental stress than are the native populations.
 
 
 217
 The special circumstances surrounding the remaining native stands of Monterey pine has led to their placement on the California Native Plant Society's Inventory of Rare and Endangered Vascular plant (1988) as a species of limited distribution. The impact on the native Monterey pine forest is considered significant.
 
 
 218
 SAR 25:7789 (FEIS IV:30).
 
 
 219
 Moreover, other parts of the Final EIS/R also discuss this subject, notably in Chapter VI which is entitled, "Environmental Consequences, Cumulative Impacts." In this separate chapter, the document takes note of the combined adverse environmental impacts of this project with the "ongoing urbanization of the Carmel area." The document says,
 
 
 220
 These adverse cumulative impacts are the result of the combined impacts of many types of activities and are not solely attributable to the proposed project alternative. Both non-transportation and transportation related projects must be taken into account when evaluating the cumulative impacts to resources. Examples of non-transportation impacts include those generated by major residential and commercial development and land use changes. As discussed previously (Growth Inducement Analysis) other development projects in the Carmel area are expected regardless of whether or not one of the proposed project alternatives is implemented. Should one of the alternatives not be implemented there would be no noticeable reduction or avoidance of cumulative adverse impacts. This is due to the relatively small contribution of the proposed project alternatives to the cumulative adverse impact on the area resources. In fact, each of the project alternatives would result in some improvement in traffic conditions.
 
 The summary of this chapter is as follows
 
 221
 As discussed earlier, measurable project impacts on sensitive resources such as water quality, floodplains, natural vegetation, and endangered species habitat could have the potential for adding, to some degree, to the overall cumulative impacts on that resource. However, mitigation developed for the individual resource impacts, as discussed in the Environmental Consequences section of this document, will even further reduce the projects's potential contribution to those cumulative impact.
 
 
 222
 Finally, the majority bases its remand in part on the absence in the excerpt of record of the Carmel Valley Master Plan EIR which is explicitly incorporated by reference in and thus part of the Final EIS/R's chapter on cumulative impacts. What the majority seems to have overlooked is the fact that the district court formally took judicial notice of this and other relevant Plans on pages 6-9 of its Order dated 5/12/94. Thus, if we are concerned about the precise content of the Carmel Valley Master Plan and its Cumulative Impact Section (I am not), the remedy is not to remand but to ask the parties to supply us with the judicially noticed documents which are already part of the record.
 
 
 223
 In summary, I do not conclude that the Final EIS/R's discussion of cumulative impacts was defective. The document's discussion of this subject easily satisfies the majority's Fritiofson test. Fritiofson v. Alexander, 772 F.2d 1225, 1245 (5th Cir.1985).
 
 CONCLUSION
 
 224
 Any person even remotely familiar with the environmental havoc existing in industrial counties without environmental protection laws must fully support our nation's laudable efforts to preserve for ourselves and our children the outdoor wonders of the great country in which we live. But, too much of anything can be trouble, and one can only wonder if this case and the tortured history of this traffic amelioration proposal suggest that too much process now renders any controversial project too difficult and costly to accomplish, regardless of its merit. After all, it is highly probable that a sizeable majority of those persons who almost 50 years ago in 1947 identified this traffic problem are no longer with us. In any event, and with all respect for my able colleagues, their approach to parts of this case cannot be reconciled either with NEPA or with Supreme Court and Ninth Circuit precedent. Once again, as happened in Methow Valley Citizens at the circuit level, 833 F.2d 810, we appear to have turned NEPA into a substantive rather than a procedural mechanism, and a nit-picking one at that. Homer, if writing The Odyssey today, might well substitute for the King of Corinth's boulder and hill the daunting task of pushing this traffic congestion initiative to completion. The damage of this case, however, transcends the scope of the Hatton Canyon Freeway because it will be used in the future by attorneys and district courts to replicate and to perpetuate this mistaken approach, especially as to analogues to the wetlands issue. Thus, although I concur in the majority's handling of the issues I do not address, I respectfully dissent as to those that I do; and I would affirm the district court's correct decision in this case.
 
 
 
 [1]
 Throughout this opinion, references have been included to the state and federal administrative records. State administrative record references use the format: volume number in Arabic numerals, SAR, page numbers. Federal administrative record references use the format volume number in Roman numerals, FAR, page numbers. Where they may be helpful, parallel citations to the specific document are also included. In citations (and some quotations), the Draft EIS/R is referred to as "DEIS/R", and the Final EIS/R is referred to as "FEIS/R."
 
 
 [2]
 Traffic planners rate traffic flow on a scale, called Level of Service, of A to F. A is unrestricted flow, and F is severe congestion. Level of Service C is stable traffic flow, where speed and maneuverability are limited by a high volume of cars. Level of Service D indicates short delays, and Level of Service E indicates longer delays
 
 
 [3]
 The Army Corps of Engineers and the Environmental Protection Agency have the authority to make wetlands determinations. See United States v. Ellen, 961 F.2d 462, 464-465 (4th Cir.1992) (describing statutory scheme for wetlands regulation); Novick, et al., 2 Law of Environmental Protection § 12.06[b][iii] (1996)
 
 
 [4]
 We note in passing that preparation of an adequate EIS/R is not necessarily the final procedural requirement when a proposed action involves wetlands. There must also be obtained from the Army Corps of Engineers a permit, issued under § 404 of the Clean Water Act, 33 U.S.C. § 1344, and related regulations, e.g., 33 C.F.R. Parts 320-330; 40 C.F.R. Part 230
 
 
 [5]
 In order to be incorporated by reference, material must "be cited in the [EIS] and its content briefly described." 40 C.F.R. § 1502.21. Presumably, this requirement serves to ensure that the EIS is understandable to a reader without undue cross-referencing. See Natural Resources Defense Council v. Duvall, 777 F.Supp. 1533, 1539 (E.D.Cal.1991). Here, the reference to the Carmel Valley Master Plan EIR satisfies neither the letter nor the spirit of the requirements for incorporation by reference
 
 
 [6]
 But see 1991 Monterey County Congestion Management Plan, (adopting Level of Service C as a goal rather than a requirement and stating that part of Highway 1, which currently operates at Level of Service F, should be improved to Level of Service E). XIII FAR 5732-5735
 
 
 [7]
 The Draft EIS/R defines the different levels of service as follows:
 Level of Service C is still in the zone of stable flow, but speeds and maneuverability are more closely controlled by the higher volumes. Most of the drivers are restricted in their freedom to select their own speed, change lanes, or pass.
 Level of Service D approaches unstable flow, with tolerable operating speeds being maintained though considerably affected by changes in operating conditions. Fluctuations in volumes and temporary restrictions to flow may cause substantial drops in operating speeds.
 Draft EIS/R at I-7; 6 SAR 3127.
 
 
 [8]
 Alternative 4 Modified was added to the Final EIS/R in response to comments received on the Draft EIS/R. The fact that traffic would still flow at bad or unacceptable levels for a substantial portion of the project area demonstrates that Alternative 4 Modified was developed only in response to public comments on the Draft EIS/R, and not in light of the changed statement of purpose and need. Final EIS/R at II-6; 24 SAR 7665
 
 
 [9]
 Carmel also argues that the Final EIS/R should have considered the alternative recommended in the Smith Report. We disagree. The Federal Highway Administration and Caltrans adequately considered and rejected the Smith Report in a 7-page memorandum dated July, 26, 1991. IX FAR 3995-4001. Because many of the reasons for rejecting the Smith Report were criticisms of its methodology, however, valid rejection of the Smith report does not necessarily entail rejection of a two-interchange, four-lane highway widening alternative
 
 
 [10]
 Federal defendants cite City of Grapevine v. Dep't of Transp., 17 F.3d 1502 (D.C.Cir.), cert. denied, 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994). This case is not on point. The D.C. Circuit held that an EIS was not inadequate for failing to consider airport capacity expansion alternatives located away from the airport. In the present case, both highway widening and Hatton Canyon alternatives are the analogue of Grapevine 's on-site airport expansion
 
 
 [11]
 Defendants imply that attainment of Level of Service C was a necessary component of any acceptable solution. However, although the California Coastal Commission recognizes that the goal of the project is to "improve the capacity" of Highway 1, how much improvement is necessary is not clear. The Coastal Commission recognizes that getting to Level of Service C is the amount of improvement the Monterey County Transportation Commission would ultimately like to achieve, but their letter does not show that they understand that anything less than Level of Service C, e.g., Level of Service D, would necessarily be unsatisfactory
 Similarly, the Smith Report does not provide "overwhelming evidence" that appellants' own experts understood before the publication of the final EIS/R that achieving Level of Service C was a requirement of any acceptable solution to the problem of Highway 1 congestion. In fact, the report refers to Level of Service D as a "tolerable" level of service. II FAR 7469. As the Smith Report stated in its Summary of Findings:
 Whereas the maintenance of Level of Service (LOS) C is a desirable objective from the standpoint of traffic service and mobility, and is a current policy objective of some public agencies, such as Monterey County, this threshold is seldom attained in every location in any urban area as large as the Monterey/Carmel/Pacific Grove area. The attainment of LOS C is not an inflexible institutionalized mandate. Traffic improvement plans for many highway corridors of this state are not designed to maintain LOS C; LOS D is used as an acceptable (tolerable) threshold in many areas. Caltrans itself has no plans to upgrade certain congested corridors in other areas to LOS C, or even LOS D. Monterey County is now formally evaluating its LOS policy as part of the Congestion Management Program; it is possible that D or E will soon be considered officially acceptable for major arterials and highways.
 II FAR 7484 (emphasis added).
 The fact that the Defendants may have specified Level of Service C as a goal in their "Preferred Alternative Recommendation," issued June 22, 1987, does not support the position that Level of Service C was a mandatory goal from the outset. Level of Service C was not specified as a goal in the draft EIS/R, and the range of alternatives considered was not changed--either when the "preferred alternative" was selected or when the final EIS/R was prepared.
 Finally, in response to the Defendants' implication that any acceptable highway improvement alternative would provide no less than Level of Service C, the Smith Report explains that forecasting traffic conditions to Year 2010 is especially difficult for the Monterey Peninsula. II FAR 7426-38 (Smith Report, chap. 3: "Future Growth and Baseline Traffic Conditions"). According to the Smith Report, Level of Service C may not be a realistic project goal and may be changed. II FAR 7471-75 (citing telephone conversation in which Congestion Management Agency Transportation Planner Joe Lopez "indicated that Highway 1 may well be considered for a less strict standard (LOS D or E as opposed to C)," and detailing reasons why Level of Service C was a questionable goal). Under these circumstances, it is not implausible that Defendants, at the time of the draft EIS/R, pursued the project with a willingness to accept the "tolerable" Level of Service D.
 
 
 [12]
 Some traffic would still be at Level of Service E and F in the year 2010, even with the Hatton Canyon freeway. 25 SAR 7878-7879